EMPLOYERS MUTUALS, Appellant, vs. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY, Respondent.

*November 9—December 5, 1950.*

134

For the appellant there was a brief by *O'Melia & Kaye* of Rhinelander, and oral argument by *John F. O'Melia.*

*Reginald W. Nelson* of Milwaukee, for the respondent.

BROADFOOT, J. The first question to be determined is whether the gravel road running from U. S. Highway 13 easterly to the railway property leased by the county and the oil company is a public highway or a private crossing. The evidence discloses that this road had been traveled since approximately the year 1914. The building used by Price county was first used by a pickle company and later by a potash company before being leased to the county. The bulk oil station had also been maintained there for many years. Customers and employees of all lessees used the road. There was evidence that said road had been used by people traveling to and from a lake located about one hundred fifty feet east of the railway property. The extent of that travel and number of years the road was used by persons going to and from the lake is not definite. The road was not a recorded highway. There is no evidence that public funds were ever expended upon said road or that any work was done thereon by any public authority. The lease with Price county described the road as a private crossing. The city of Phillips did not list this road as a public highway for the purpose of determining the amount of gasoline tax to be paid to the city by the state. There were no "no trespassing" or "private" signs in the vicinity of the crossing.

The trial court considered that the rules set forth in the case of *Langer v. Chicago, M., St. P. & P. R. Co.* 220 Wis. 571, 265 N. W. 851, determined this question. In that case there was evidence of public use of the crossing for more

than twenty years, and there was, in addition, evidence that at times there were instances of improvements by the expenditure of public funds thereon. Here, as in the *Langer Case, supra,* it is apparent that the use of the road was a use associated with railroad property; that the use was permissive and not adverse in character; and that such use did not make the road a public highway. From the evidence the trial court found that the gravel road was a private crossing and that the provisions of sec. 192.29 (1) of the 1945 statutes did not apply. We affirm that determination.

The appellant next claims that, even though the gravel road is a private road, the railway company had a common-law duty through its train crew to operate the train in a reasonable and prudent manner. Appellant contends that the defendant's agents were negligent as to speed, for failure to ring the bell on the engine as it approached the crossing, that they failed to maintain a proper lookout, and that they were negligent in the management and control of the train. The appellant contends that the evidence warrants the following as a statement of facts most favorable to it:

"The deceased being a highway patrolman was in charge of the vehicle and at approximately 8:15 a.m., and after the truck was loaded, proceeded to turn the vehicle around and then drive westerly over the same roadway, and toward U. S. Highway 13. The deceased put the vehicle in extreme low, it having four shifts ahead, and after traveling some thirty-five or forty feet, shifted into second, which would be comparable to low gear on a passenger vehicle.

"As the truck operated by the deceased neared the eastern-most spur track, his vision to the left or the south, from which defendant's train was approaching, was obscured by a Texaco bulk-oil-company shed and warehouse. The westerly edge of the Texaco building was a distance of approximately thirty-three feet from the center of the main-line track on which defendant's train was operating at the moment of impact. which train was coming from the deceased's left, or the

south, and traveling in a northerly direction toward Ashland, its destination.

"The deceased was operating the county truck at a speed of approximately two to three miles an hour as it came from the areaway of the spur track and as it crossed the spur track, and proceeded toward the main-line track. At about the time the vehicle, operated by the deceased, got to the spur tracks, the passenger, Dewey Connor, turned down his frosted window, on the right side of the cab of the vehicle, a distance of about six inches to listen for and observe any train that might be coming from his right, or the north, traveling southerly toward Phillips. A freight train of the defendant's company was due from the north at about the time of this accident. Connor was able to see a distance to the north of from twelve to fifteen hundred feet, and did not observe a train coming, and did not hear any warning device of an approaching train, although he was listening. Connor did have earlaps on his hat that were over his ears, but they did not interfere with his hearing. From the time that he turned down his window until the time of the impact, about ten to fifteen seconds elapsed. Connor did not know whether or not the vehicle came to a stop at any time before the impact, much of which time was consumed by him in the operation of the window because it was mechanically faulty.

"The truck, operated by deceased, continued at the same speed until it stopped or stalled on the main-line tracks, after which it didn't move, and was struck by the train in the center of the left rear wheel. U. S. Highway 13, on which eyewitness Krenek was located runs parallel with the main-line track, a distance of only about one hundred feet to the west of the main-line track. At the moment the vehicle was viewed stopped or stalled on the main-line tracks, the front of the train was, according to that eyewitness, a distance of about five hundred feet from the truck, or the center of the intersection.

"The engineer testified that his view from a curve south of the intersection in question was excellent for a distance of nine hundred fifty feet and that he at no time saw the truck in question, excepting a moment before the impact, when the front of the engine was a distance of from twenty-five to forty-five feet from the truck, that being the first time the

whistle was sounded. His vision had been obscured during that nine hundred fifty feet for a distance of only one hundred feet when smoke trailing from the engine made visibility difficult. That was corrected by the engineer putting more steam into the cylinders of the engine, and thereby raising the smoke and increasing the engine speed. The fireman at no time saw the stalled truck before the impact, testifying to that effect twice and on one occasion stating he saw the front of it protrude just the moment before impact.

"The deceased was instantly killed, and gave no evidence or testimony of any kind. The window on the deceased's side of the cab was down approximately six inches immediately after the impact. The front of the train's engine struck the center of the left rear wheel, which wheel was a distance of approximately nine feet from the position of the deceased, sitting in the cab of the truck.

"The train in question was approximately four hundred sixty-one feet in length, less approximately forty inches consumed by the couplers, when joined and attached, as they were at the time the train was operating. The train was placed in an emergency-brake position by the engineer, when he first viewed the truck, or when the front of the engine was from twenty-five to forty-five feet away from the truck. The train was not derailed, and came to a stop, with the last car south of the center of the intersection, or the coupling between the last two cars was approximately where the truck was located at the time of impact. The rear car was approximately eighty-three and one-tenth feet in length."

Other evidence indicates that the deceased had been employed by Price county for several years and was very familiar with the gravel road and the location of the tracks and buildings. The engineer testified that the bell on the locomotive was operated automatically from the time it left the depot at Phillips. The witness Krenek testified that the truck stalled or stopped on the main track ten to fifteen seconds before the collision occurred. The appellant argues that Krenek's testimony demonstrates that had the train crew maintained a proper lookout they would have seen the truck stalled upon the track when the train was five hundred feet

away. The evidence shows that the train was stopped in a distance of less than five hundred feet. Appellant claims that this presented a jury issue and that it was error for the trial court to direct a verdict.

The trial court did not find any negligence on the part of the train crew. It stated that even though negligence on the part of the defendant were found, the deceased was negligent as a matter of law and that his negligence would be as great or greater than that of the train crew under the evidence most favorable to the appellant. The trial court called attention to the low rate of speed at which the truck was driven, indicating thereby that it could have stopped quickly; the opportunity for the deceased to look to the left and to observe the train coming; that if he failed to look he was negligent and that if he looked and saw the train and continued to proceed, he was also negligent. We agree with its conclusions.

*By the Court.*—Judgment affirmed.